1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| LANNY O'CONNELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC.,<br><br>Defendant. | Case No.    2:25-cv-1661<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Lanny O'Connell files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Marriott International, Inc. ("Defendant" or "Marriott"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used marriott.com (the "Website"), a website that Defendant owns and operates.

2. Defendant aids, employs, agrees with, or otherwise enables several third parties – Adobe Inc. ("Adobe"); LinkedIn Corp. ("LinkedIn"); and Meta Platforms, Inc. ("Meta") (collectively, the "Third Parties") – to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by Cal. Civil Code § 53.5). By failing to procure consent before enabling the Third Parties' interception of these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3. Plaintiff Lanny O'Connell is a resident and citizen of Atascadero, California. In or around 2016, Plaintiff O'Connell created a Facebook account. Several times, including on or around February 12, 2025, Plaintiff O'Connell visited Defendant's Website, marriott.com, on the same browser that he used to access Facebook. Plaintiff O'Connell was in California when he visited the Website. Upon accessing the Website, as alleged in greater detail below, Plaintiff O'Connell browsed and booked a Marriott hotel. Each of these communications was intercepted in transit by the Third Parties – as enabled by Defendant – including communications that contained Plaintiff O'Connell's confidential "guest records," as defined by Cal. Civil Code § 53.5. Neither Defendant nor the Third Parties procured Plaintiff O'Connell's

prior consent to this interception.

4.     Defendant Marriott International, Inc. is a Delaware corporation with its principal place of business at 7750 Wisconsin Avenue, Bethesda, Maryland 20814. Defendant does business across the nation and operates numerous hotels throughout California.[1]

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

6.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, and Defendant assisted the Third Parties with intercepting Plaintiff's communications in this District.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I.     The California Invasion of Privacy Act

8.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of

---

[1] https://www.extendedstayamerica.com/hotels/ca.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2

1    personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal

2    Code § 630.

3        9.    The California Supreme Court has repeatedly stated an "express

4    objective" of CIPA is to "protect a person placing or receiving a call from a situation

5    where the person on the other end of the line *permits an outsider to tap his telephone*

6    *or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

7        10.    Further, as the California Supreme Court has held in explaining the

8    legislative purpose behind CIPA:

9
10
11        While one who imparts private information risks the betrayal of
12        his confidence by the other party, a substantial distinction has
           been recognized between the secondhand repetition of the
           contents of a conversation and its *simultaneous dissemination to*
           *an unannounced second auditor, whether that auditor be a*
           *person or mechanical device.*
13

14        As one commentator has noted, such secret monitoring denies
15        the speaker an important aspect of privacy of communication—
           the right to control the nature and extent of the firsthand
16        dissemination of his statements.

17    *Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations

18    omitted).

19        11.    As part of CIPA, the California Legislature enacted § 631(a), which

20    prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any

21    unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and

22    without the consent of all parties to the communication … read[ing], or attempt[ing]

23    to read, or to learn the contents or meaning of any … communication while the same

24    is in transit or passing over any wire, line, or cable, or is being sent from, or received

25    at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any

26    information so obtained."

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    3

12.     CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

15.     Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendant.

**II.     California Civil Code § 53.5**

16.     As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential. Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a).

17.     Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record
> that identifies an individual guest, boarder, occupant, lodger,
> customer, or invitee, including, but not limited to, their name,
> social security number or other unique identifying number, date
> of birth, location of birth, address, telephone number, driver's

license number, other official form of identification, credit card number, or automobile license plate number.

18.    Further, the legislative history of § 53.5 indicates:

(a) In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

(b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

(c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

(d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

(e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[2]

19.     Here, Website users' communications with Marriott – made while browsing and booking Marriott hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

20.     First, the communications include "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  As described *infra*, §§ IV, VI, Defendant enables Adobe to identify individual Website users with the Adobe Experience Cloud Identity Service and/or Adobe Experience Platform Identity Service, which collect and utilize cookie IDs, cross-device IDs, device IDs, email addresses, and/or phone numbers.  Defendant enables LinkedIn to identify individual Website users by their respective LinkedIn member accounts, utilizing several cookies, including the _guid;

---

[2] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

lms_ads; and lms_analytics cookies. Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.). These pieces of data collected by Adobe, LinkedIn, and Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals. *Id.*

21. Website users' communications with Marriott also "identif[y] an individual [as a Marriott] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications. These communications "identif[y] an individual [as a Marriott] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Marriott – individuals with "express or implied invitation to enter or use [Marriott's] premises."[3] These communications also identify certain Website users (those who complete the booking process) as Marriott hotel "guests" and "customers."

22. Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5. Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil

---

[3] INVITEE, Black's Law Dictionary (11th ed. 2019).

Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Marriott] that has no independent right to use or share the data beyond the terms of the contract." Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant. *See infra*, § VII. Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

III.    **Overview of Defendant's Website**

23.    Defendant owns and operates the Website. Defendant has integrated the Third Parties' wiretaps into the Website.

24.    On the Website, Website users can, *inter alia*, browse and book Marriott hotels. When doing so, Website users provide Defendant with confidential information, including "guest records" under Cal. Civil Code § 53.5. *See supra* § II.

25.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using the Third Parties' respective wiretaps, as set out *infra*.

26.    Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

27.     Website users may browse and book Marriott hotel rooms.  To do so, users type and/or select from a list the destination to which they wish to travel. Next, users click the dates for their trip, the number of rooms required, the number of adults and children who will be traveling, and/or special rates for which they are eligible. The Third Parties, as enabled by Defendant, contemporaneously intercept Website users' button clicks selecting such items:



Website "Screen 1"

28.     Then, Website users review the Marriott hotels located in or near their destination and click on a particular hotel to book.

//
//
//
//
//
//
//
//
//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



Website "Screen 2"

17
18    29.    Website users subsequently pick the type of room (i.e., double, queen,
19  king bed, etc.) in which they wish to stay.
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28  //



**Website "Screen 3"**

30.    Finally, Website users check out by typing their personal information (first and last name, email, phone number) and entering their payment information.



**Website "Screen 4"**

## IV.    Overview of the Third Parties' Tracking Technologies

31.    Adobe, LinkedIn, and Meta each wiretap the Website with their respective tracking technologies, which Defendant purposefully installed on the Website.

32.    The Third Parties' tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant.  Thus, the Third Parties' interception of these communications occurs "in transit."  *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (holding that in-transit interception was alleged based on similar process to the one alleged herein).

### A.    Adobe

33.    Adobe wiretaps the Website with trackers associated with the "Adobe

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    12

Experience Cloud."[4]  Specifically, analysis of the Website reveals that Defendant utilizes the Adobe Experience Platform Web SDK, Adobe Experience Platform Tags and several tag extensions, Adobe Analytics, Adobe Target, Adobe Audience Manager, and/or the Adobe Experience Cloud Identity Service:



---

[4] *See* ADOBE, ADOBE EXPERIENCE CLOUD, https://business.adobe.com; ADOBE, DATA INSIGHTS & AUDIENCES, https://business.adobe.com/solutions/data-insights-audiences.html; ADOBE, ADOBE EXPERIENCE CLOUD PRODUCTS, https://business.adobe.com/products/adobe-experience-cloud-products.html; ADOBE, ENTERPRISE DOCUMENTATION, https://experienceleague.adobe.com/en/docs.

---

34.    The Adobe Experience Platform Web SDK[5] is a code library that "send[s] data[] to [Adobe's] next generation Experience Edge Network, which [] direct[s] the data to [the] Adobe Experience Platform, as well as Experience Cloud applications, like Adobe Analytics, Target and Audience Manager."[6]  The Experience "Platform Web SDK … [does so by] collaps[ing] and compress[ing] all Adobe product libraries into a single development kit for web … platforms[.]"[7]

35.    Adobe Experience Platform Tags[8] are pieces of "code … that [website operators, like Defendant] put on [their] webpages to load and execute [certain] logic"[9] and "send [data] to [] marketing and advertising solutions[.]"[10]  This includes when there is "a page load, a click, a custom JavaScript event, etc."[11]

36.    On information and belief, Defendant's deployment of the Adobe Experience Cloud involves a number of "tag extensions"[12] that "extend[] the

---

[5] *See* ADOBE, WEB SDK INSTALLATION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/install/overview.

[6] ADOBE, ADOBE EXPERIENCE PLATFORM WEB SDK, https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/home.  *See also* ADOBE, ADOBE EXPERIENCE PLATFORM DATA COLLECTION END-TO-END OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/collection/e2e.

[7] ADOBE, DATA COLLECTION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/collection/home.

[8] ADOBE, TAGS OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/home.

[9] ADOBE, ADD THE EMBED CODE, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/configure-tags/add-embed-code.

[10] ADOBE, ADD A DATA ELEMENT, A RULE AND A LIBRARY, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/configure-tags/add-data-elements-rules.

[11] *Id.*

[12] ADOBE, EXTENSIONS OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/overview.

---

functionalities provided by [the Adobe Experience Platform] tags[.]"[13]  Specifically, analysis of the Website reveals that Defendant utilizes the Adobe Analytics, Adobe Target, and Adobe Experience Cloud Identity Service extensions,[14] among others. *See infra*, § VI.

37.    Adobe Analytics[15] offers "real-time insights based on a holistic view of [the] customer[,]"[16] including "complex segmentation and predictive tools for analyzing website traffic[]"; "marketing analytics" that "help[] organizations understand where customers interact with their brands, which channels customers prefer, and which experiences resonate with them[]"; "[a]ttribution [that] lets organizations see how different interactions throughout the customer journey affect conversion[]"; and "[p]redictive analytics [that] uses machine learning and advanced statistical modeling to analyze customer data, find patterns, and predict future behavior[.]"[17]

38.    Adobe Target[18] can be used to "[c]reate A/B and multivariate tests to learn the most effective combination of content, layouts, UX, and more through []

---

[13] *Id.*

[14] *See* ADOBE, IMPLEMENT THE EXPERIENCE CLOUD IN WEBSITES WITH TAGS TUTORIAL, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/overview.

[15] *See* ADOBE, ADD ADOBE ANALYTICS, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/implement-solutions/analytics; ADOBE, ADOBE ANALYTICS EXTENSION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/analytics/overview.

[16] ADOBE, ADOBE ANALYTICS, https://business.adobe.com/products/analytics/adobe-analytics.html

[17] ADOBE, ANALYTICS USE CASES, https://experienceleague.adobe.com/en/docs/analytics/analyze/admin-overview/use-cases.

[18] *See* ADOBE, ADD ADOBE TARGET, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/implement-solutions/target; ADOBE, ADOBE TARGET EXTENSION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/target/overview.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    15

websites[.]"[19]  With "AI and machine learning, powered by Adobe Sensei, [clients] can test and personalize at scale well beyond what [they've] been able to achieve with manual or rules-driven approaches alone."[20]

39.    The Adobe Experience Cloud Identity Service[21] is used, in conjunction with the Adobe Experience Platform Identity Service, to "piece together a complete picture of [a] customer" by "link[ing] their disconnected identi[fiers,]" which Adobe calls "identities[.]"[22]  "Identities" that are collected and stitched together include, *inter alia*: "[c]ookie IDs"[23] such as "the Experience Cloud ID (ECID)"[24] that "identify web browsers"[25]; "[c]ross-device IDs" such as "CRMID" that "identify an individual and [] tie other IDs together"; "[d]evice IDs" such as "IDFA (iPhone and iPad), GAID

---

[19] ADOBE, ADOBE TARGET BENEFITS, https://business.adobe.com/products/target/benefits.html.

[20] *Id.*

[21] *See* ADOBE, ADD THE ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/platform-learn/implement-in-websites/implement-solutions/id-service; ADOBE, ADOBE EXPERIENCE CLOUD IDENTITY SERVICE EXTENSION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/id-service/overview.

[22] ADOBE, ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/experience-platform/identity/home.

[23] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

[24] ADOBE, ADOBE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/home. *See also* ADOBE, HOW THE EXPERIENCE CLOUD IDENTITY SERVICE REQUESTS AND SETS IDS, https://experienceleague.adobe.com/en/docs/id-service/using/intro/id-request; ADOBE, COOKIES AND THE EXPERIENCE CLOUD IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies.

[25] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces. *See also* ADOBE, ADOBE EXPERIENCE PLATFORM IDENTITY SERVICE, https://experienceleague.adobe.com/en/docs/experience-platform/identity/home ("[t]he browser identifier (such as ECID) [] represents the web browser.").

---

(Android), and RIDA (Roku)" that "identify hardware devices"; "[e]mail addresses"; and "[p]hone numbers[.]"[26]  This data is presented visually in an "identity graph[,]" which is a "map of [the] relationships between [] identities" (i.e., cookie IDs, cross-device IDs, device IDs, email addresses, phone numbers, etc.) "for a single individual[.]"[27]  Ultimately, said identity graphs (and the data contained therein) can be used to gain a comprehensive "view of individual customers and their behavior"[28] and identify them "across all applications in Adobe Experience Cloud."[29]

## B.    LinkedIn

40.    LinkedIn wiretaps the Website with trackers associated with the "LinkedIn Insight Tag," which is a "code snippet [that website operators, like Defendant] add[] to [their] website[s] [to] help [] optimize [advertising] campaigns, retarget [] website visitors, and learn more about [website] audiences."[30]  The "LinkedIn Insight Tag enables the collection of data regarding [individuals'] visits to [a] website, including [] URL, referrer, IP address, device and browser characteristics (User Agent), [] timestamp[,]" and "actions [such as ]button clicks, page visits, and form submissions[.]"[31]

41.    The Insight Tag "relies on LinkedIn cookies, which enable [LinkedIn] to match [] website visitors to their respective LinkedIn member accounts. Once

---

[26] *Id.*

[27] ADOBE, IDENTITY AND IDENTITY GRAPHS OVERVIEW, https://experienceleague.adobe.com/en/docs/platform-learn/tutorials/identities/understanding-identity-and-identity-graphs.

[28] ADOBE, IDENTITY NAMESPACE OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/namespaces.

[29] ADOBE, ECID OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/ecid.

[30] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[31] LINKEDIN, UNDERSTANDING WEBSITE ACTIONS, https://www.linkedin.com/help/lms/answer/a1377941.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    17

matched, [LinkedIn] can tally [website users'] actions in Campaign Manager so [advertisers] can use the data to analyze [a] website's conversion flows and optimize [] ad campaigns."[32]  Notably, advertisers can "[t]arget [] ideal customer[s] based on traits like their job title, company name, industry, and by professional or personal interests" and "deliver unique content based on actions [a website user] ha[s] taken[.]"[33] Website operators can also "add enhanced matching … [to] send additional information with [] Insight Tag data, such as an email address provided when a customer submits a form on [a] website."[34]  This helps "match [even] more [ ] website visitors to LinkedIn accounts."[35]

### C.    Meta

42.    Meta wiretaps the Website with trackers associated with the "Meta Pixel."[36]  According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[37]  Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[38]  Advertisers can also create their own tracking parameters by

---

[32] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[33] LINKEDIN, AD TARGETING, https://business.linkedin.com/marketing-solutions/cx/21/10/ad-targeting. *See also* LINKEDIN, MATCHED AUDIENCES, https://business.linkedin.com/marketing-solutions/ad-targeting/matched-audiences; LINKEDIN, CONVERSION TRACKING, https://business.linkedin.com/marketing-solutions/conversion-tracking.

[34] LINKEDIN, ENHANCED MATCHING FOR YOUR WEBSITE, https://www.linkedin.com/help/lms/answer/a6241147.

[35] *Id.*

[36] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[37] *Id.*

[38] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655. *See also* META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

---

building a "custom event."[39]    Thus, the Meta Pixel helps "understand[] the actions people take on [a] website."[40]

43.    The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[41]    Additionally, "[w]ith advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."[42]

44.    This is highly useful for marketing and advertising.    Specifically, the Meta Pixel can be used to help "measure ad effectiveness"; "define custom audiences for ad targeting"; and support "Advantage+ catalog ads campaigns[.]"[43]

45.    With respect to measuring ad effectiveness, "[t]rack[ing ] website visitors' actions[,] also known as conversion tracking[,] ... can be used to … calculate [] return[s] on ad investment[s]."[44]   "In [the] Meta Ads Manager, [website operators] can see how many conversions happened as a result of [their] Meta ads."[45]    This includes "cross-device reporting, which lets [advertisers] see cross-device conversions across apps and the web (for example, if a customer sees an ad for a product on their

---

[39] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[40] *Id.*

[41] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[42] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[43] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[44] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[45] META, USE CONVERSION TRACKING TO MEASURE RESULTS, https://www.facebook.com/business/help/339239069606476.

---

mobile phone, but decides to buy it later on their desktop computer)."[46]

46.    A "custom audience is an ad targeting option"[47] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[48] Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.  Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[49]  Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers[]" (i.e., "Lookalike Audience[s]").[50]

47.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Meta clients] to create thousands of ads without having to configure each of them individually."[51] Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[52]

## V.    Defendant Aids, Agrees with, Employs, or Otherwise Enables the Third Parties to Wiretap Californians' Communications

### A.    Adobe

48.    Adobe, as enabled by Defendant, contemporaneously intercepts the

---

[46] *Id.*

[47] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[48] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[49] *Id.*

[50] *Id.*

[51] META, META PIXEL FOR ADVANTAGE+ CATALOG ADS, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[52] *Id.*

---

following Website communications.

```
v1: uri=www.marriott.com/default.mi:loc=Search Form :linkDescription= Suggested place: San Francisco
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
v41: US
v192: www.marriott.com/default.mi
pe: lnk_o
pev2: Custom Link Click
```

```
v1: uri=www.marriott.com/default.mi:loc=Search form :linkDescription= Adults Increment button
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
v41: US
v192: www.marriott.com/default.mi
pe: lnk_o
pev2: Custom Link Click
```

```
v1: uri=www.marriott.com/default.mi:loc=Search form :linkDescription= Children Increment button
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
v41: US
v192: www.marriott.com/default.mi
pe: lnk_o
pev2: Custom Link Click
```

```
v1: uri=www.marriott.com/default.mi:loc=Search Form:linkDescription= Senior Discount
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
v41: US
v192: www.marriott.com/default.mi
pe: lnk_o
pev2: Custom Link Click
```

//

//

//

//

//

//

//

▼ webPageDetails: {...}
    URL: "https://www.marriott.com/search/findHotels.mi?fromToDate_submit=02/26/2025&fromDate=02/25/2025&toDate=02/26/2025&toDateDefaultFormat=02/26/2025&

https://www.marriott.com/search/findHotels.mi?
fromToDate_submit=02/26/2025&fromDate=02/25/2025&toDate=02/26/2025&toDateDefaultFormat=02/26/2025&fromDateDefaultFormat=02/25/20
25&flexibleDateSearch=false&t-start=02/25/2025&t-
end=02/26/2025&lengthOfStay=1&childrenCountBox=1+Children+Per+Room&childrenCount=1&childrenAges=0&clusterCode=none&useRewardsP
oints=false&isAdvanceSearch=false&recordsPerPage=20&destinationAddress.type=City&destinationAddress.latitude=37.7749295&isInternalSearch=tr
ue&vsInitialRequest=false&searchType=InCity&destinationAddress.stateProvinceDisplayName=CA&countryName=US&destinationAddress.stateProvin
ce=CA&searchRadius=50&singleSearchAutoSuggest=Unmatched&destinationAddress.placeId=ChIJIQBpAG2ahYAR_6128GcTUEo&for-hotels-
nearme=Near&destinationAddress.country=US&destinationAddress.address=San+Francisco,+CA,+USA&collapseAccordian=is-
hidden&singleSearch=true&destinationAddress.secondaryText=CA,
+USA&destinationAddress.city=San+Francisco&destinationAddress.mainText=San+Francisco&isTransient=true&...

        mr_prof_address_country_abbr: ""
        mr_prof_address_state: ""
        mr_prof_authentication_state: "unauthenticated"
        mr_prof_rewards_level: ""
        mr_prof_stay_in_progress: ""
        promotion_id: ""
        prop_address_city: ""
        prop_address_city_state_country: ""
        prop_address_country_abbr: ""
        prop_address_state_abbr: ""
        prop_brand_code: ""
        prop_brand_name: ""
        prop_brand_tier: ""
        prop_marsha_code: ""
        prop_name: ""
        res_confirmation_number: ""
        res_guest_address_country_abbr: ""
        res_isRedemption: ""
        res_market_code: ""
        res_num_adults: "2"
        res_num_children: "1"
        res_revenue_adr_rate_usd: ""
        res_revenue_currency_type: ""
        res_revenue_total: ""
        res_revenue_total_locale: ""
        res_rooms_per_night: "1"
        res_stay_length: "1"
        reservation_iata_number: ""
        search_advance_purchase_days: "41"
        search_brands: "all|"
        search_cluster_code: "standard"
        search_currency_type: "Default"
        search_date_check_in: "02/25/2025"
        search_date_check_in_yyyy_mm_dd: "2025-02-25"
        search_date_check_out: "02/26/2025"
        search_date_check_out_yyyy_mm_dd: "2025-02-26"
        search_dates_flexible: "false"
        search_destination_city: "San Francisco"
        search_destination_city_state_country: "SAN FRANCISCO:CA:US"

49.    As shown by the red highlight in the above excerpts of the Website's transmissions, Adobe intercepts the destination selected by users (here, "San Francisco").  As shown by the yellow highlights, Adobe intercepts the desired trip dates selected by users (here, "fromDate=02/25/2025" and "toDate=02/26/2025"). As shown by the green highlights, Adobe intercepts the numbers of rooms and guests selected by users (here, "res_rooms_per_night: '1'"; "res_num_adults: '2'"; and "res_num_children: '1'").  As shown by the blue highlight, Adobe intercepts the special rates selected by users (here, "Senior Discount").  These communications are the product of button clicks on Website Screen 1.

```
▶ webPageDetails: {URL: "https://www.marriott.com/reservation/rateListMenu.mi", server: "true"}
▶ webReferrer: {,…}
▼ _marriott_intl: {affiliate: "", prop_name: Residence Inn San Francisco Airport Millbrae Station,…}
    affiliate: ""
    browser_akamai_loc_country: "US"
    device_language_preferred: ""
    env_site_id: "US"
    facebook_content_type: "hotel,destination"
    lowercase_marsha_code_comma_seprated: ""
    marketingCampaignTrackingData: ""
    mr_cei_SttBhvSeg: ""
    mr_enrolled: ""
    mr_id_alternate: ""
    mr_prof_address_country_abbr: ""
    mr_prof_address_state: ""
    mr_prof_authentication_state: "unauthenticated"
    mr_prof_rewards_level: ""
    mr_prof_stay_in_progress: ""
    promotion_id: ""
    prop_address_city: "Millbrae"
    prop_address_city_state_country: "Millbrae|CA|US"
    prop_address_country_abbr: "US"
    prop_address_state_abbr: "CA"
    prop_brand_code: "RI"
    prop_brand_name: "Residence Inn"
    prop_brand_tier: "Longer Stays"
    prop_marsha_code: "SFOMI"
    prop_name: Residence Inn San Francisco Airport Millbrae Station
    res_confirmation_number: ""
    res_guest_address_country_abbr: ""
    res_isRedemption: "false"
    res_market_code: ""
    res_num_adults: "2"
    res_num_children: "1"
    res_revenue_adr_rate_usd: ""
    res_revenue_currency_type: "USD"
    res_revenue_total: ""
    res_revenue_total_locale: ""
    res_rooms_per_night: "1"
    res_stay_length: "1"
    reservation_iata_number: ""
    search_advance_purchase_days: "26"
    search_brands: "all|"
    search_cluster_code: "S9R"
    search_currency_type: "Default"
    search_date_check_in: "02/25/2025"
    search_date_check_in_yyyy_mm_dd: "2025-02-25"
    search_date_check_out: "02/26/2025"
    search_date_check_out_yyyy_mm_dd: "2025-02-26"
    search_dates_flexible: "false"
    search_destination_city: "San Francisco"
    search_destination_city_state_country: "SAN FRANCISCO:CA:US"
    search_destination_country: "US"
    search_destination_state: "CA"
    search_guests_per_room: "3"
```

50.    As shown by the purple highlights in the above excerpt of the Website's transmissions, Adobe intercepts the particular Marriott hotel selected by users (here, "Residence Inn San Francisco Airport Millbrae Station"). These communications are the product of button clicks on Website Screen 2.

```
pageName: www.marriott.com/reservation/rateListMenu.mi
g: https://www.marriott.com/reservation/rateListMenu.mi
cc: USD
events: event2,event999
v1: uri=www.marriott.com/reservation/rateListMenu.mi:loc=Ratetab:linkDescription Prepay and Save
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
```

```
pageName: www.marriott.com/reservation/rateListMenu.mi
g: https://www.marriott.com/reservation/rateListMenu.mi
cc: USD
events: event2,event999
v1: uri=www.marriott.com/reservation/rateListMenu.mi:loc=Ratetab:linkDescription=Standard Rates
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
```

```
pageName: www.marriott.com/reservation/rateListMenu.mi
g: https://www.marriott.com/reservation/rateListMenu.mi
cc: USD
events: event2,event999
v1: uri=www.marriott.com/reservation/rateListMenu.mi:loc=Ratetab:linkDescription=Deals and Packages
c5: US
v22: unauthenticated
c26: AEM-phoenix-prod
```

51.    As shown by the orange highlights in the above excerpts of the Website's transmissions, Adobe intercepts miscellaneous other selections by users (here, "Prepay and Save"; "Standard Rates"; and "Deals and Packages"). These communications are the product of button clicks on Website Screen 3.

**B.    LinkedIn**

52.    LinkedIn, as enabled by Defendant, contemporaneously intercepts the following Website communications.

```
▼ {pids: [360572], scriptVersion: 183, time: 1736973965134, domain: "marriott.com",…}
    ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "DIV",…}
        backgroundImageSrc: null
        cursor: "pointer"
        elementSemanticType: null
        elementTitle: null
        elementType: null
        elementValue: null
        imageAlt: null
        imageSrc: null
        innerText: San Francisco\nCA, USA
```

```
▼ {pids: [360572], scriptVersion: 183, time: 1736974019111, domain: "marriott.com",…}
    ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "DIV",…}
        backgroundImageSrc: null
        cursor: "pointer"
        elementSemanticType: null
        elementTitle: Tue Feb 25 2025
        elementType: null
        elementValue: null
        imageAlt: null
        imageSrc: null
        innerText: "25"
```

```
▼ {pids: [360572], scriptVersion: 183, time: 1736974019912, domain: "marriott.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "DIV",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: Wed Feb 26 2025
      elementType: null
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: "26"
```

```
▼ {pids: [360572], scriptVersion: 183, time: 1736974107168, domain: "marriott.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "button"
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: Add Adults
      onClick: "Search form | Adults Increment button |internal"
```

```
▼ {pids: [360572], scriptVersion: 183, time: 1736974108029, domain: "marriott.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "button"
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: Add Children
      onClick: "Search form | Children Increment button |internal"
```

```
▼ {pids: [360572], scriptVersion: 183, time: 1736974173711, domain: "marriott.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: "button"
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: 1 Room, 3 Guests
```

```
▼ {pids: [360572], scriptVersion: 183, time: 1736974226494, domain: "marriott.com",…}
  ▼ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "LABEL",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: Senior Discount
```

pid: 360572
time: 1736974684336
li_adsId: de2526b4-b476-4a1d-be0b-7f615a564106
url: https://www.marriott.com/search/findHotels.mi?fromToDate_submit=02/26/2025&fromDate=02/25/2025&toDate=02/26/2025&toDat
eDefaultFormat=02/26/2025&fromDateDefaultFormat=02/25/2025&flexibleDateSearch=false&t-start=02/26/2025&t-end=02/26/2025&le
ngthOfStay=1&childrenCountBox=1+Children+Per+Room&childrenCount=1&childrenAges=0&clusterCode=none&useRewardsPoints=false&i
sAdvanceSearch=false&recordsPerPage=20&destinationAddress.type=City&destinationAddress.latitude=37.7749295&isInternalSearc
h=true&vsInitialRequest=false&searchType=InCity&destinationAddress.stateProvinceDisplayName=CA&countryName=US&destination
ddress.stateProvince=CA&searchRadius=50&singleSearchAutoSuggest=Unmatched&destinationAddress.placeId=ChIJIQBpAG2ahYAR_6128
GcTUEo&for-hotels-nearme=Near&destinationAddress.country=US&destinationAddress.address=San+Francisco,+CA,+USA&collapseAcco
rdian=is-hidden&singleSearch=true&destinationAddress.secondaryText=CA,+USA&destinationAddress.city=San+Francisco&destinati
onAddress.mainText=San+Francisco&isTransient=true&destinationAddress.longitude=-122.4194155&initialRequest=false&flexibleD
ateSearchRateDisplay=false&isSearch=true&isRateCalendar=false&destinationAddress.destination=San+Francisco,+CA,+USA&isHide
FlexibleDateCalendar=false&roomCountBox=1+Room&roomCount=1&guestCountBox=2+Adult+Per+Room&numAdultsPerRoom=2&deviceType=de
sktop-web&view=list#/0/

53.     As shown by the red highlights in the above excerpts of the Website's transmissions, LinkedIn intercepts the destination selected by users (here, "San Francisco").  As shown by the yellow highlights, LinkedIn intercepts the desired trip dates selected by users (here, "fromDate=02/25/2025" and "toDate=02/26/2025"). As shown by the green highlights, LinkedIn intercepts the numbers of rooms and guests selected by users (here, "roomCount=1"; "numAdultsPerRoom=2" and "childrenCount=1").  As shown by the blue highlight, LinkedIn intercepts the special rates selected by users (here, "Senior Discount").  These communications are the product of button clicks on Website Screen 1.

{pids: [360572], scriptVersion: 199, time: 1738211022321, domain: "marriott.com",…}
  domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "BUTTON",…}
    backgroundImageSrc: null
    cursor: "pointer"
    elementSemanticType: null
    elementTitle: "Residence Inn San Francisco Airport Millbrae Station"
    elementType: null
    elementValue: null
    imageAlt: null
    imageSrc: null
    innerText: "Residence Inn San Francisco Airport Millbrae Station"
    onClick: "Phoenix Search Results| Residence Inn San Francisco Airport Millbrae Station |internal"
    tagName: "BUTTON"
  domain: "marriott.com"

54.     As shown by the purple highlights in the above excerpt of the Website's transmissions, LinkedIn intercepts the particular Marriott hotel selected by users (here, "Residence Inn San Francisco Airport Millbrae Station").  These communications are the product of button clicks on Website Screen 2.

//

//

▾ {pids: [360572], scriptVersion: 199, time: 1738211159209, domain: "marriott.com",…}
  ▾ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "IMG",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      imageAlt: "King Bed Studio Sitting Area"

55.    As shown by the brown highlight in the above excerpt of the Website's transmissions, LinkedIn intercepts the room type selected by users (here, via an image titled, in relevant part, "King Bed Studio").  These communications are the product of button clicks on Website Screen 3.

**C.    Meta**

56.    Meta, as enabled by Defendant, contemporaneously intercepts the following Website communications.

id: 836072006419889
ev: SubscribedButtonClick
dl: https://www.marriott.com/default.mi
rl:
if: false
ts: 1736974173916
cd[buttonFeatures]: {"classList":"t-font-weight-m t-font-xs ","destination":"","id":"Rooms & Guests","imageUrl":"","innerText":"1 Room, 3 Guests","numChildButtons":0,"tag":"button","type":"button","name":"Rooms & Guests","value":""}

id: 836072006419889
ev: SubscribedButtonClick
dl: https://www.marriott.com/default.mi
rl:
if: false
ts: 1736974226589
cd[buttonFeatures]: {"classList":"spl-rates-radio-container m-radio-button-xs","destination":"","id":"","imageUrl":"","innerText":"Senior Discount","numChildButtons":0,"tag":"div","type":null}
cd[buttonText]: Senior Discount

//
//
//
//
//
//
//

id: 836072006419889

ev: Search

dl: https://www.marriott.com/search/findHotels.mi?fromToDate_submit=02%2F26%2F2025&fromDate=02%2F25%2F2025&toDate=02%2F2
6%2F2025&toDateDefaultFormat=02%2F26%2F2025&fromDateDefaultFormat=02%2F25%2F2025&flexibleDateSearch=false&t-start=02%2F
25%2F2025&t-end=02%2F26%2F2025&lengthOfStay=1&childrenCountBox=1+Children+Per+Room&childrenCount=1&childrenAges=0&clust
erCode=none&useRewardsPoints=false&isAdvanceSearch=false&recordsPerPage=20&destinationAddress.type=City&destinationAddr
ess.latitude=_removed_&isInternalSearch=true&vsInitialRequest=false&searchType=InCity&destinationAddress.stateProvinceD
isplayName=CA&countryName=US&destinationAddress.stateProvince=CA&searchRadius=50&singleSearchAutoSuggest=Unmatched&dest
inationAddress.placeId=ChIJIQ8pAG2ahYAR_6128GcTUEo&for-hotels-nearme=Near&destinationAddress.country=US&destinationAddr
ess.address=San+Francisco%2C+CA%2C+USA&collapseAccordian-is-hidden&singleSearch=true&destinationAddress.secondaryText=C
A%2C+USA&destinationAddress.city=San+Francisco&destinationAddress.mainText=San+Francisco&isTransient=true&destinationAd
dress.longitude=_removed_&initialRequest=false&flexibleDateSearchRateDisplay=false&isSearch=true&isRateCalendar=false&d
estinationAddress.destination=San+Francisco%2C+CA%2C+USA&isHideFlexibleDateCalendar=false&roomCountBox=1+Room&roomCount
=1&guestCountBox=2&Adult+Per+Room&numAdultsPerRoom=2&deviceType=desktop-web&view=list#/0/

rl: https://www.marriott.com/search/submitSearch.mi?fromToDate_submit=02%2F26%2F2025&fromDate=02%2F25%2F2025&toDate=02%2
F26%2F2025&toDateDefaultFormat=02%2F26%2F2025&fromDateDefaultFormat=02%2F25%2F2025&flexibleDateSearch=false&t-start=02%
2F25%2F2025&t-end=02%2F26%2F2025&lengthOfStay=1&childrenCountBox=1+Children+Per+Room&childrenCount=1&childrenAges=0&clu
sterCode=none&useRewardsPoints=false&isAdvanceSearch=false&recordsPerPage=20&destinationAddress.type=City&destinationAd
dress.latitude=_removed_&isInternalSearch=true&vsInitialRequest=false&searchType=InCity&destinationAddress.stateProvinc
eDisplayName=CA&countryName=US&destinationAddress.stateProvince=CA&searchRadius=50&singleSearchAutoSuggest=Unmatched&de
stinationAddress.placeId=ChIJIQ8pAG2ahYAR_6128GcTUEo&for-hotels-nearme=Near&destinationAddress.country=US&destinationAd
dress.address=San+Francisco%2C+CA%2C+USA&collapseAccordian-is-hidden&singleSearch=true&destinationAddress.secondaryText
=CA%2C+USA&destinationAddress.city=San+Francisco&destinationAddress.mainText=San+Francisco&isTransient=true&destination
Address.longitude=_removed_&initialRequest=false&flexibleDateSearchRateDisplay=false&isSearch=true&isRateCalendar=false
&destinationAddress.destination=San+Francisco%2C+CA%2C+USA&isHideFlexibleDateCalendar=false&roomCountBox=1+Room&roomCou
nt=1&guestCountBox=2+Adult+Per+Room&numAdultsPerRoom=2&deviceType=desktop-web

if: false

ts: 1736974685223

cd[value]:

cd[currency]:

cd[content_name]:

cd[content_category]:

cd[content_type]: ["hotel","destination"]

cd[num_items]:

cd[search_string]:

cd[status]:

cd[loyalty_tier]:

cd[country]:

cd[region]:

cd[city]:

cd[brand]:

cd[checkin_date]: 2025-02-25

cd[checkout_date]: 2025-02-26

cd[num_travelers]: 3

cd[num_rooms]: 1

57.    As shown by the red highlights in the above excerpts of the Website's transmissions, Meta intercepts the destination selected by users (here, "San+Francisco").  As shown by the yellow highlights, Meta intercepts the desired trip dates selected by users (here, "[checkin_date]: 2025-02-25" and "[checkoutdate]: 2025-02-26"). As shown by the green highlights, Meta intercepts the numbers of

rooms and guests selected by users (here, "[num_rooms]: 1"; "numAdultsPerRoom=2"; and "childrenCount=1").  As shown by the blue highlights, Meta intercepts the special rates selected by users (here, "Senior Discount").  These communications are the product of button clicks on Website Screen 1.

id: 836072006419889
ev: SubscribedButtonClick
dl: https://www.marriott.com/search/findHotels.mi?fromToDate_submit=02/26/2025&fromDate=02/25/2025&toDate=02/26/2025&toDateDefaultFormat=02/26/2025&fromDateDefaultFormat=02/25/2025&flexibleDateSearch=false&t-start=02/25/2025&t-end=02/26/2025&lengthOfStay=1&childrenCountBox=1&children+Per+Room&childrenCount=1&childrenAges=0&clusterCode=none&useRewardsPoints=false&isAdvanceSearch=false&recordsPerPage=20&destinationAddress.type=City&destinationAddress.latitude=37.7749295&isInternalSearch=true&vsInitialRequest=false&searchType=InCity&destinationAddress.stateProvinceDisplayName=CA&countryName=US&destinationAddress.country=US&destinationAddress.stateProvince=CA&searchRadius=50&singleSearchAutoSuggest=Unmatched&destinationAddress.placeId=ChIJIQ8pAG2ahYAR_6128GcTUEo&for-hotels-nearme=Near&destinationAddress.secondaryText=CA,+USA&collapseAccordion=is-hidden&singleSearch=true&destinationAddress.secondaryText=CA,+USA&destinationAddress.city=San+Francisco&destinationAddress.mainText=San+Francisco&isTransient=true&destinationAddress.longitude=-122.4194155&initialRequest=false&flexibleDateSearchRateDisplay=false&isSearch=true&isRateCalendar=false&destinationAddress.destination=San+Francisco,+CA,+USA&isHideFlexibleDateCalendar=false&roomCountBox=1+Room&roomCount=1&guestCountBox=2+Adult+Per+Room&numAdultsPerRoom=2&deviceType=desktop-web&view=list&showFullPrice=false&currency=default&showAvailableHotels=false&amenities=breakfast#/4/
rl: https://www.marriott.com/search/submitSearch.mi?fromToDate_submit=02%2F26%2F2025&fromDate=02%2F25%2F2025&toDate=02%2F26%2F2025&toDateDefaultFormat=02%2F26%2F2025&fromDateDefaultFormat=02%2F25%2F2025&flexibleDateSearch=false&t-start=02%2F25%2F2025&t-end=02%2F26%2F2025&lengthOfStay=1&childrenCountBox=1+Children+Per+Room&childrenCount=1&childrenAges=0&clusterCode=none&useRewardsPoints=false&isAdvanceSearch=false&recordsPerPage=20&destinationAddress.type=City&destinationAddress.latitude=37.7749295&isInternalSearch=true&vsInitialRequest=false&searchType=InCity&destinationAddress.stateProvinceDisplayName=CA&countryName=US&destinationAddress.country=US&destinationAddress.stateProvince=CA&searchRadius=50&singleSearchAutoSuggest=Unmatched&destinationAddress.placeId=ChIJIQ8pAG2ahYAR_6128GcTUEo&for-hotels-nearme=Near&destinationAddress.address=San+Francisco%2C+CA%2C+USA&collapseAccordion=is-hidden&singleSearch=true&destinationAddress.secondaryText=CA%2C+USA&destinationAddress.city=San+Francisco&destinationAddress.mainText=San+Francisco&isTransient=true&destinationAddress.longitude=-122.4194155&initialRequest=false&flexibleDateSearchRateDisplay=false&isSearch=true&isRateCalendar=false&destinationAddress.destination=San+Francisco%2C+CA%2C+USA&isHideFlexibleDateCalendar=false&roomCountBox=1+Room&roomCount=1&guestCountBox=2+Adult+Per+Room&numAdultsPerRoom=2&deviceType=desktop-web
if: false
ts: 1736976600212
cd[buttonFeatures]: {"classList":"m-button-primary-inverse t-label-alt-m quick-filter-option-button button-secondary custom_click_track  custom_click_track","destination":"","id":"","imageUrl":"","innerText":"Pool (42)","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}
cd[buttonText]: Pool (0)

58.  As shown by the orange highlight in the above excerpt of the Website's transmissions, Meta intercepts miscellaneous other selections by users (here, "Pool" as in filtering for a hotel with a swimming pool).  This communication is the product of a button click on Website Screen 2.

## VI.  Defendant Enables the Third Parties to Pair the Above Data with Users' Identities

59.  As discussed *supra*, § IV, the Adobe, LinkedIn, and Meta tracking technologies at issue can pair wiretapped data with website users' identities.

60.  The tracking technologies achieve this, at least in part, through cookies.  A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage

---

(persistent cookie)."[53]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[54]

### A.     Adobe

61.     Through the Adobe Experience Cloud Identity Service, in conjunction with the Adobe Experience Platform Identity Service, Adobe can identify individual website users with, *inter alia*, cookie IDs, cross-device IDs, device IDs, email addresses, and phone numbers.

62.      The following image confirms that Defendant has enabled the Adobe Experience Cloud Identity Service on the Website.



### B.     LinkedIn

63.     Through LinkedIn cookies, LinkedIn can identify individual website users by their respective LinkedIn member accounts.

64.     The following image confirms that, when a user accesses the Website while logged into LinkedIn, the LinkedIn tracking technologies on the Website compel

---

[53] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[54] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

---

that user's browser to transmit several cookies, including the _guid; lms_ads; and lms_analytics cookies.



65.    The _guid cookie is "[u]sed to identify a LinkedIn Member for advertising through Google Ads" and has a lifespan of ninety days.[55]

66.    The lms_ads cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising" and has a lifespan of thirty days.[56]

67.    The lms_analytics cookie is "[u]sed to identify LinkedIn Members off LinkedIn for analytics" and has a lifespan of thirty days.[57]

**C.    Meta**

68.    Through Facebook cookies, Meta can identify individual website users by their respective Facebook accounts.  Through advanced matching, Meta can also identify individual website users by the personal information they provide on websites (i.e., name, email address, phone number, etc.).

69.    The following image confirms that, when a user accesses the Website while logged into Facebook, the Meta tracking technologies on the Website compel that user's browser to transmit several cookies, including the c_user; datr; fr; and

---

[55] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[56] *Id.*

[57] *Id.*

1  \_fbp[58] cookies:



| Name | Value | Domain |
|------|-------|--------|
| _fbp | ██████████████ | .marriott.com |
| fr | ████████████████ | .facebook.com |
| xs | ████████████████ | .facebook.com |
| c_user | ████████████ | .facebook.com |
| presence | ████████████████ | .facebook.com |
| wd | ██████ | .facebook.com |
| sb | ███████████████ | .facebook.com |
| datr | ██████████████ | .facebook.com |

70.   The c_user cookie contains, at least, the user's unencrypted Facebook ID.[59]  The c_user cookie has a lifespan of three hundred sixty-five days.[60]

71.   The datr cookie contains, at least, a value that uniquely identifies a browser.[61]  The datr cookie has a lifespan of four hundred days.[62]

72.   The fr cookie contains, at least, a value that uniquely identifies a browser

_____

[58] Note, the Meta Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  The \_fbp cookie is always transmitted as a first-party cookie.  A duplicate \_fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.  Pictured here and in the *infra* two images is the \_fbp cookie, sent as a first-party cookie.

[59] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[60] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[61] *Id.* ("'Datr' is a unique identifier for your browser[.]").

[62] *Id.*

_____

and the user's encrypted Facebook ID.[63]  The fr has a lifespan of ninety days.[64]

73.    The _fbp cookie contains, at least, a value that uniquely identifies a browser.[65]  The _fbp has a lifespan of ninety days.[66]

74.    When a Website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies:



75.    No matter the circumstances, Facebook compels the visitor's browser to transmit the _fbp cookie:

| Name | ▲ | Value | Domain |
|------|---|-------|--------|
| _fbp |   | ██████████████ | .marriott.com |

76.    Defendant also uses "Advanced Matching."  With Advanced Matching, Defendant's Meta Pixels "look for recognizable form field and other sources on [the]

---

[63] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[64] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[65] Id. ("Cookie[:] _fbp[.] Description[:] These cookies identify browsers for businesses using our Meta Products for the purposes of providing advertising and site analytics services."). See also FACEBOOK, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters#fbp ("The Facebook browser ID value is stored in the _fbp browser cookie[.]").

[66] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

---

website that contain information such as first name, last name and email."[67]    That information is recorded, "along with the event, or action, that took place."[68]

77.    Specifically, as part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[69]  The highlighted line below shows that Defendant enabled Automatic Matching.

```
159        fbq.loadPlugin("automaticmatchingforpartnerintegrations");
160        instance.optIn("836072006419889", "AutomaticMatchingForPartnerIntegrations", true);
161        config.set(null, "batching", {
  -            "batchWaitTimeMs": 10,
  -            "maxBatchSize": 10
```

78.    Thus, Meta, as enabled by Defendant, contemporaneously intercepts users' names, email address, phone numbers, and/or other personal details using the Meta Pixel on various pages of the Website.  Although these personal details are "hashed,"[70] the reality is that, even in hashed form, they are traceable to individuals.[71]

---

[67] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[68] Id.

[69] See META, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/
advanced-matching; META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/
business/help/611774685654668.

[70] Id.

[71] See, e.g., FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/
paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful

---

79.     Defendant discloses this information to Meta so that Meta can better match Website visitors to their Facebook profiles, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[72]

## VII.   The Third Parties Use Californians' Data for their Own Purposes

80.     When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, the Third Parties – separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.  The Third Parties, themselves, collect the contents of said conversations.  That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

81.     The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

82.     In the "Adobe Experience Cloud Terms of Use," Adobe states: "You grant Adobe a worldwide, royalty-free, non-exclusive, transferable, and sublicensable license to adapt, display, distribute, modify, perform, publish, reproduce, translate, and use Your Materials for the purpose of operating, marketing and improving the Services and enabling your use of the Services."[73]  Adobe defines "Materials" as "any materials

---

privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[72] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[73] ADOBE, ADOBE EXPERIENCE CLOUD TERMS OF USE, https://www.adobe.com/content/dam/cc/en/

---

provided by You, Adobe, or a third party, including without limitation any (a) user material, including usage and telemetry activities; (b) reports, text, code, data, documents, images, photographs, graphics, audio, videos, or webcasts; (c) products; or (d) Software."[74]  Thus, Adobe has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, operating, marketing, and improving its services.

83.    In its "LinkedIn Ads Agreement," LinkedIn states: "As part of the Analytics services, to improve ad relevance and reach, LinkedIn may use your Audience Data, whether during or after the term of this Ads Agreement, to analyze and optimize LinkedIn algorithms and to find LinkedIn members probabilistically across devices[.]"[75] LinkedIn further states, in its "LinkedIn Data Processing Agreement," that it will "[p]rocess Customer Personal Data … for the purpose of providing, supporting and improving LinkedIn's services (including to provide insights and other reporting)[.]"[76]  In fact, it seems that, even "on termination of [] data processing services" by a LinkedIn client, LinkedIn "may continue to Process Customer Personal Data that has been aggregated in a manner that does not identify individuals or customers to improve LinkedIn's systems and services."[77]  Thus, LinkedIn has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, analyzing and optimizing LinkedIn's algorithms, finding LinkedIn members, and providing, supporting, and improving LinkedIn's systems and services.

---

legal/servicetou/Experience_Cloud_TOU_en_WW_20220608.pdf. *See also* ADOBE, LICENSES AND TERMS, https://www.adobe.com/legal/licenses-terms.html.

[74] *Id.*

[75] LINKEDIN, LINKEDIN ADS AGREEMENT, https://www.linkedin.com/legal/sas-terms.

[76] LINKEDIN, LINKEDIN DATA PROCESSING AGREEMENT, https://www.linkedin.com/legal/l/dpa.

[77] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    36

84.    In its "Meta Business Tools Terms,"[78] Meta confirms that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[79]  Further, Meta can "disclose [] Campaign Reports or Analytics … to [] third part[ies,] … [if] they have been combined with Campaign Reports and Analytics from numerous other third parties and [the advertiser using the Meta Business Tools has had its] identifying information [] removed from the combined Campaign Reports and Analytics."[80]  And Meta can use the information it collects to "improve the effectiveness of ad delivery, [] determine the relevance of ads to people[,] … [and] personalize the features and content (including ads and recommendations) that [Meta] show[s] people on and off [] Meta Products."[81]  Thus, Meta has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, its own research and development; ad delivery; feature and content personalization; and product improvement, provision, and securement.

## VIII. Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties

85.    Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for Adobe, LinkedIn, or Meta to engage in this wiretapping.

86.    Nowhere on the Website does Defendant provide notice of its privacy-related practices that is prominently displayed, designed to attract Website users' attention, and distinctive in appearance.

---

[78] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.
[79] *Id.*
[80] *Id.*
[81] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    37

87.    Nowhere on the Website does Defendant adequately disclose the tracking here at issue, including that:

- The Third Parties, as enabled by Defendant, intercept the contents of Californians' communications on the Website, in real time.

- These communications include, but are not limited to, "guest records," which are affirmatively entered by users on the Website and confidential under Cal. Civil Code § 53.5(c). Namely, the Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications.

- This information is not anonymized because Defendant enables the Third Parties to link users' communications with personal information that reveals their identities. Such personal information includes cookie IDs/the values contained in cookies, cross-device IDs, device IDs, email addresses, and/or phone numbers, which constitute "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

88.    Nowhere on the Website does Defendant request or receive Website users' affirmative consent *prior to* enabling the Third Parties' tracking technologies. Analysis of the Website reveals that the Third Parties' tracking technologies are active as soon as the Website loads, before Website users could even conceivably be put on notice or provide affirmative consent.

## CLASS ALLEGATIONS

89.    Plaintiff seeks certification of the following class: all California residents who have accessed and navigated the Website while in California (the "Class").

90.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

91.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

92.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.   Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.   Moreover, the Class is ascertainable and identifiable from Defendant's records.

93.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

94.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    39

Website and had his confidential electronic communications intercepted and disclosed to the Third Parties.

95. **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

96. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 631(a)

97. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

---

98.    Plaintiff brings this Count individually and on behalf of the members of the Class.

99.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

100.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of

protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

101. The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

102. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties have the capability to use the wiretapped information for their own purposes. Accordingly, Adobe, LinkedIn, and Meta were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

103. At all relevant times, by their tracking technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

104. At all relevant times, the Third Parties used or attempted to use the communications intercepted by their tracking technologies for their own purposes.

105. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Third Parties' tracking technologies and to accomplish the wrongful conduct at issue here.

106. Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications. Nor did

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    42

Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

107.  The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties – as enabled by Defendant – routed Plaintiff's and Class Members' electronic communications to the Third Parties' servers.

108.  Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**

109.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

110.  Plaintiff brings this Count individually and on behalf of the members of the Class.

111.  CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

112.  The Third Parties' tracking technologies are "electronic amplifying or recording device[s]." *Id.*

113.  Cal. Civ. Code § 53.5(a) states:

> [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations, or any employee or agent thereof, who offers or accepts payment for rooms, sleeping accommodations, or board and lodging, or other similar

accommodation, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

114.    Per Cal. Civil Code § 53.5(c):

"Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

115.    Here, Website users' communications with Defendant – made while browsing and booking Marriott hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

116.    First, the communications include "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  Defendant enables Adobe to identify individual Website users with the Adobe Experience Cloud Identity Service and/or Adobe Experience Platform Identity Service, which collect and utilize cookie IDs, cross-device IDs, device IDs, email addresses, and/or phone numbers.  Defendant enables LinkedIn to identify individual Website users by their respective LinkedIn member accounts, utilizing several cookies, including the _guid; lms_ads; and lms_analytics cookies.  Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., name, email address, phone number, etc.).  These pieces of data collected by Adobe, LinkedIn, and Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies and other IDs at

issue contain "unique identifying number[s]" assigned to Website users (*id.*) and the contact details (i.e., name, email address, phone number, etc.) at issue are sufficient to identify individuals. *Id.*

117. Second, Website users' communications with Marriott "identif[y] an individual [as a Marriott] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* The Third Parties intercept Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay. The Third Parties also intercept the URL of webpages visited by Website users – containing the foregoing communications. These communications "identif[y] an individual [as a Marriott] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Marriott – individuals with "express or implied invitation to enter or use [Marriott's] premises. "[82] These communications also identify certain Website users (those who complete the booking process) as Marriott hotel "guests" and "customers."

118. Thus, the Third Parties – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5. Moreover, none of the Third Parties is a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because none of the Third Parties is "an entity contracted to provide services outlined in [a] contract [with Marriott] that has no independent right to use or share the data beyond the terms of the contract." Rather, the Third Parties have the capability to use the information they wiretap for purposes other than simply providing a recording to Defendant. Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code § 53.5(i).

119. When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5.

---

[82] INVITEE, Black's Law Dictionary (11th ed. 2019).

Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Adobe, LinkedIn, and Meta, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

120.    Plaintiff and Class Members did not consent to any of the Third Parties' actions.    Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

121.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

1    (h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

2

3                            **<u>JURY TRIAL DEMAND</u>**

4    Plaintiff demands a trial by jury on all causes of action and issues so triable.

5

6    Dated:  February 26, 2025                Respectfully submitted,

7                                            **BURSOR & FISHER, P.A**.

8

9                                            By:   */s/ Philip L. Fraietta*
                                                  Philip L. Fraietta
10

11                                           Philip L. Fraietta (State Bar No. 354768)
                                             1330 Avenue of the Americas, 32nd Floor
12                                           New York, NY 10019
                                             Telephone: (646) 837-7150
13                                           Facsimile: (212) 989-9163
                                             Email: pfraietta@bursor.com
14

15                                           **BURSOR & FISHER, P.A.**
                                             Stefan Bogdanovich (State Bar No. 324525)
16                                           1990 North California Blvd., 9th Floor
                                             Walnut Creek, CA 94596
17                                           Telephone: (925) 300-4455
                                             Facsimile:  (925) 407-2700
18                                           E-mail: sbogdanovich@bursor.com

19                                           *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    47